IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2002

**STATE OF TENNESSEE v. ANTHONY D. FORSTER**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-B-1181  Seth Norman, Judge**

---

**No. M2002-00008-CCA-R3-CD - Filed April 1, 2003**

---

The defendant, after being allowed to represent himself at the sentencing hearing, proceeds pro se in appealing his especially aggravated robbery conviction and sentence of twenty-two years imprisonment.  The defendant argues his right to a speedy trial was violated and argues he was subject to an unreasonable delay in sentencing.  The defendant argues the trial court improperly denied the defendant's motion to sever the offenses.  The defendant argues the trial judge abused his discretion in failing to recuse himself and contends the trial court erroneously allowed a witness to testify to injuries she sustained as a result of the robbery.  The defendant argues the trial court improperly ruled the defendant was not entitled to be present during jury deliberations.  The defendant argues the trial court frustrated his right to appeal by relieving his trial counsel prior to sentencing.  The defendant argues he is the victim of a malicious prosecution.  We conclude the trial court did not err and evidence supports the defendant's conviction of especially aggravated robbery.  Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Anthony D. Forster, Tiptonville, Tennessee, Pro Se (on appeal), and John G. Oliva, Nashville, Tennessee (at trial).

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Pamela Anderson and Jason Lawless, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On June 27, 2000, the defendant, Anthony D. Forster, was indicted by a Davidson County Grand Jury for one count of aggravated robbery, two counts of aggravated assault, and one count of especially aggravated robbery.  For crimes occurring at West Meade Cleaners and Arby's, the

defendant was acquitted on all charges, except the charge for especially aggravated robbery occurring at Arby's. The defendant was sentenced as a Range I violent offender to twenty-two years in the Tennessee Department of Correction. The defendant appeals, pro se, his conviction and sentence. The defendant presents the following issues:

      (1) whether the trial court violated his right to a speedy trial and sentencing hearing;

      (2) whether the trial court frustrated his right to appeal by relieving his trial counsel prior to sentencing;

      (3) whether the trial judge erroneously denied his Motion for Recusal;

      (4) whether the trial court erred in denying his Motion for Acquittal and New Trial;

      (5) whether the trial court erroneously denied his motion to sever the offenses;

      (6) whether the trial court erroneously ruled that the defendant not be entitled to be present during jury deliberations.

      (7) whether the trial court improperly sentenced the defendant;

      (8) whether the defendant is a victim of a malicious prosecution.

## I. Facts

Before giving our analysis of the instant case, we will recite the facts leading to this appeal for the purposes of addressing the defendant's issues regarding severance of the offenses and as it relates to the sufficiency of evidence. We will only consider facts developed relating to the especially aggravated robbery occurring at Arby's.

Judy Dotson, employee of the West Meade Cleaners, testified she was robbed at seven o'clock on the morning of June 18, 1997. She stated that while helping a customer, she saw a very large black man come through the door and put his arm around the customer's shoulder. She stated that she thought the men were friends but realized that she was wrong when the man pulled a gun from a pouch and pointed at her. She said she knew that they were being robbed, so she backed away and started to run. She said the man was saying something to the customer, but she couldn't understand what he was saying. She said the man told her to stop, but she ran out the side door.

Dotson testified that after running to the front of the building, she saw a black man sitting in an older model blue car. She said she asked him to call "911" because the cleaner was being robbed. She said he reached for the door knob as if he was going to open the door, but he blew the horn. She said she realized the man in the car was the "other person," and she ran to a bagel shop and asked them to call "911." She stated the man in the blue car was of an average build, with curly hair and long shaved-like sideburns.

Dotson testified she saw the defendant leave the cleaners and get into the blue car that she had approached for help. She said that after the defendant got into the car, the car quickly backed up to the highway and drove toward Charlotte Pike with the trunk of his car open.

On cross-examination, Dotson testified that her supervisor opened the cleaners on the day of the robbery and she waited on customers. She stated the man who robbed the cleaners wore some kind of uniform. She said she was not sure but thought the man wore a shirt with the name, "Tony" on one side on a patch. She stated that she had not told anyone about the name, "Tony," being on a patch prior to trial. She said she remembered the name being on the man's shirt because her son-in-law's name is Tony. She said that after leaving from the side door, she ran into the side alley to the front of the building. Dotson testified that she picked out the picture of the man who robbed the cleaners from a bunch of photographs. She said that the police did not indicate she had picked the right person. On redirect, Dotson testified that the front of the cleaners is all glass and the blue car was parked in front of the cleaners.

Patricia Greer, a manager of West Meade Cleaners, testified that she was in the back of the cleaners on the day the robbery occurred. She stated she could see the parking lot and noticed a car parked beside her car. She saw a black man come into the cleaners and put his arm around a customer that Judy Dotson was waiting on. She said the man was tall, heavyset, with large curly hair. She said the man wore a blue uniform shirt, blue shorts, and a fanny pack.

Greer stated she began walking toward the front of the store and saw the man point the gun at the customer and push him down between the counters and the floor. She said she saw the man's gun and saw that Judy then backed up and ran. She said the man grabbed her by the arm, pulled her from where she was standing behind the register, and pushed her into the wall. She said the man then hit her arm with the gun, then turned around and held the gun back on the customer's head and said, "I said give me your damn money now." She said she opened the register, and he began to grab the money himself when she was not moving fast enough. She said that she heard a horn blow as the man finished emptying the drawer, which he threw to the floor before leaving. She said the man got into the blue car with the driver and drove out onto Davidson Drive and eventually to Interstate 40. She stated she slid down behind the register and called 911 once the man left the cleaners. She said the man took one hundred dollars in cash and a bad check.

On cross-examination, Greer testified she did not know the defendant. She said police asked her to pick the picture of the man who robbed the cleaners from a lineup of six pictures. She said she did not pick the defendant's picture out of the lineup the police gave her. She said the man did not hide his face when he robbed the cleaners. She said she could see out the front of the cleaners through the glass windows. She said she did not know there was anything wrong until she saw the man with a gun. She said that when the police first arrived at the crime scene she told them the man hit her arm with his gun. She said she did not go to the doctor about the bruise on her arm.

Teresa Obispado, an employee of Arby's on Donelson Pike, testified that she was working on June 18, 1997, when Arby's was robbed. She said she was robbed between 9:30 a.m. and 9:40 a.m. She said she had just come out of the bakery when another employee stopped her and told her they were being robbed. She said she hit the panic button and then saw the man who was robbing the restaurant. She stated that as she stood in the back, she saw the man come from the back door, around to the corner, and to the front by the cash registers. She said the man was black, more than

six feet tall, and two-hundred pounds. She said the man came around the corner with the manager and screamed, "Hurry up, you stupid bitch, I want the money." She said she noticed the manager had blood on the side of her face. She said the man told her manager to turn around and lay down on the ground. She said police showed her a photographic lineup, and she chose a picture of the defendant as the man who robbed the restaurant. The prosecution asked Obispado if she saw the individual who robbed Arby's, and she identified the defendant as the perpetrator.

On cross-examination, Obispado testified that approximately an hour after the robbery, she picked out a picture of the man who robbed the restaurant. She said the man picked up a fry basket, but did not swing it at her manager and followed the manager toward the phone. She said she never saw the man hit her manager.

Betty Kidwell, an employee of Arby's, testified that she was working on the day of the robbery, along with three other employees. She said another employee was outside and the back door was left open when she noticed a commotion in the office. She said she saw a large black man with lots of hair in the manager's office. She said she looked into the manager's office through the glass window and saw the man look back at her and point for her not to leave. She said she continued with her work and then saw her manager come out of her office, followed by the man. She said the man jerked up a mop bucket with a metal ringer on it, but she did not see him hit her manager. She said she ran to the back door as soon as she saw the man and her manager walk past her. She said she saw another man standing outside, between the back door and the corner where the cars were parked. She stated the other man was black and taller than herself and got into a dark blue car and the man who robbed her restaurant drove. She said she wrote down the license plate number. She said she later noticed her manager had a cut on her cheekbone that was bleeding. She said she had a chance to use the telephone in the manager's office on occasion. She said the phone was a cordless, heavy phone. She said she was shown a series of photographs, but could not identify the man who robbed the restaurant.

On cross-examination, Kidwell stated that she never saw the man coming into the restaurant, never saw him carry a weapon, and never saw the man hit her manager with any object. She said she saw the other person who was outside for only a second.

William Merrell, an officer with the Metropolitan Police Department of Nashville and Davidson County, testified that he investigated a robbery at West Meade Cleaners on June 18, 1997. He stated he dusted for fingerprints, but none were identifiable.

On cross-examination, Officer Merrell testified about his training and background. He said he did not draw sketches of Arby's or of the dry cleaners and did not photograph either of the crime scenes. He stated that he did not collect hair samples, fiber samples, or tread marks. He said he did not develop any fingerprints at the dry cleaners.

William E. Merryman, an officer with the Metropolitan Police Department of Nashville, testified he was called to Arby's on June 18, 1997, to investigate a robbery. He stated he attempted

to dust for prints, but did not obtain any prints. He said it can be difficult to obtain fingerprints in restaurants because surfaces are often covered with a skim of oil or grease.

On cross-examination, Officer Merryman testified that it is not customary for the police to take photographs of the crime scene on robberies and break-ins. He stated that he did not take pictures of the Arby's crime scene. He said he dusted the Number Two cash drawer, the portable phone, and the rear door for fingerprints, but none were recovered.

James Micheal Chastain, an officer of the Metropolitan Police Department, testified he was leaving for work on the morning of June 18, 1997, when he heard on his radio about a robbery at West Meade Cleaners. He said he heard that a small black or blue car, possibly a Suburu, was involved in the robbery. He stated he arrived at work sometime after 9:00 a.m. and heard on the county-wide radio channel that another robbery had occurred at an Arby's restaurant. He said the dispatch described the vehicle involved in the Arby's robbery, and it closely matched the vehicle involved in the West Meade Cleaners robbery. He said someone at the Arby's robbery obtained a tag number from the vehicle. He stated he wrote the tag number down as it was dispatched, ran it through the registration computer program, and found that the tag number belonged to a 1984 blue, four-door Subaru, registered to an Anthony D. Forster of Nashville. He stated he and Detective Jim Reed arrived at Arby's with a photographic line-up to show to the employees. He said each Arby's employee was shown the lineup pictures. He stated two Arby's employees, Christian and Obispado, were able to pick the defendant from the photographic lineup. He said he and Detective Reed left Arby's and went to police headquarters, where they obtained a robbery warrant for the defendant. He said they attempted to find the defendant and the vehicle by going to his residence, but did not find him that day. He said they took the lineup by the West Meade Cleaners, but neither one of the employees could positively identify the defendant.

Officer Chastain testified he found the defendant the following morning at the defendant's apartment and transported him to police headquarters. He stated that at the headquarters, the defendant was read his Miranda rights, but waived his rights and spoke to police. He said the defendant's interview was videotaped. He said that he and Detective Reed took the defendant to the side street off of Twenty-eighth Avenue and Clifton to look for the bad check that was taken in the robbery. He said the defendant directed him to White Bridge Road, Davidson Road, and Charlotte Pike and pointed at the West Meade Cleaners as the place he had been the day before. He said he helped the defendant draw a sketch of the areas, including West Meade Cleaners and Arby's, where he had been on the day of the robberies. He said the defendant showed him where he parked in the parking lot of the cleaners. He said the defendant's car appeared blue and black because of the oxidation of the paint job.

The defendant's videotaped statement was shown to the jury. The defendant said he needed money because he was "in a predicament" and had "no place to stay." The defendant stated that on the day before the robberies, he had gone to court on a vandalism charge, and his girlfriend gave him money for his bond. He said he needed additional money to repay the bond because he used the money for drugs. He stated he picked up his accomplice at a park between 6:00 a.m. and 7:00 a.m.,

"got high," and started driving around Nashville. He said his accomplice did not take part in the robberies and was not aware of what he was doing. He said he did remember wearing a Gatlinburg t-shirt and a navy blue towel around his waist with a hairbrush wrapped in it to look like a gun. He said he remembered telling a man to get down on the floor and seeing a woman run out of the business. He said he only got around two hundred dollars in cash from the robberies. He stated he did not remember much else about the robberies and that it was a blur until 3:00 p.m., when he visited his sister at work to tell her what he had done.

On cross-examination, Officer Chastain testified to his background in law enforcement and procedures for investigating a robbery. Officer Chastain testified the defendant was cooperative and, after signing a consent form, allowed the police to search through his home. Officer Chastain said he found a pair of blue shorts and a purple shirt, but he did not find any money or weapons at the defendant's home. He stated the defendant had a severe drug problem that he discussed on the videotape. He said that on the videotape, the defendant could not remember if he robbed the dry cleaners, but seemed to recollect the Arby's robbery. He said the defendant admitted robbing Arby's. He stated that although the defendant had the biggest Afro hairdo, no one at the cleaners could pick him out of the lineup. He said he did not take a picture of the portable phone from the cleaners and did not recall seeing any blood on the phone. On redirect, Officer Chastain testified the portable phone, which was one of the older-type phones with a huge base, is enormous when compared to today's modern portable phones.

Sandra Christian, an Arby's training manager, testified that on June 18, 1997, she and three other employees were robbed while preparing for Arby's to open later that day. She stated that Danny Randolph, another employee, had the back door unlocked so he could unload the food and paper truck. She stated that she noticed something was missing from the truck. She then left Danny outside so she could call the company from her office. She said that while she was on the telephone, the defendant came into the office from behind her. She said the defendant put his arm around her, tightened his grip, and told her to open the safe. She said that she was still holding the phone when the defendant grabbed the phone from her and hit her, knocking her glasses from her face. She said the phone was an old portable phone, similar to an army field phone, and was equipped with four "C" batteries. She said she had a hard time opening the safe because it is magnetic. She said the defendant became irritated, shoved her down, and grabbed her arm. She said she had already taken the cash drawers to the front of the store, so he took some loose change and bills from the safe. She said the defendant then went to the cash drawers and took the money from the first drawer. She said she was not moving fast enough, so the defendant took a fry basket and swung it at her, but missed. She said he took the money from the second drawer and told her to get down on the floor before he left out the back way. She said the defendant took three hundred dollars in cash. She said she suffered an open wound on the side of her face and a black eye inside her eye, as a result of the defendant hitting her with the portable phone. She said the phone hit her so hard that it knocked her back onto the desk and one of the batteries fell out. She said the wound took over a year to heal and that she suffered a bruise on her arm from the defendant pulling her around the restaurant. She said she received medical treatment for her injuries. She said the doctors cleaned her up and applied a butterfly bandage to the cut. She said her face was swollen for a week. She said her scar extends

from the bridge of her nose down to an area just above her lips. She said the police gave her a lineup of photos, and she chose a picture of the defendant as the man who robbed her. The prosecution asked her if she recognized her assailant in the courtroom, and she described the defendant as the perpetrator.

On cross-examination, Christian testified that on the day of the robbery, she was pulling files to see about replacements for items being unloaded in the delivery truck. She said she was on the telephone when the defendant came up behind her. She said the defendant drew back and hit her, then she noticed her glasses were broken and felt blood on her face. She said the scar on her face has been fading and is not as prominent as it once was.

At the conclusion of the State's proof, the defense called their only witness, Tracy Woods, the defendant's ex-girlfriend. Woods testified that she saw the defendant immediately prior to his arrest in June of 1997. She said she and the defendant had just broken up when he called her to pick him up from a convenience store in the Bordeaux area of Nashville. She said he was standing alone by the pay phone, when she saw two black men drive up in the defendant's Subaru around 7:00 a.m. or 7:30 a.m. She stated she remembered these events because this was the last time she had really talked to him before he was arrested for these charges.

On cross-examination, Woods testified the defendant told her his car was broke down, so she left to pick him up. She said she got dressed and left her two-year-old daughter asleep in her bed, so that she could pick up the defendant. She said the convenience store was in the Bordeaux area near the Clarksville Highway, past Tennessee State University. She said she gave the defendant a hundred and twenty-five dollars for his bond, but the defendant lied to her and used the money for drugs. She said the defendant lied to her about his car being broken because she saw two men drive up in his car after she arrived at the convenience store. She stated the defendant was coherent and functioning when she found him at the store. She said she heard about the robberies and did not call the police or tell anyone within the last three years, even though she was with him during the time frame of one of the robberies. On redirect, Woods testified that she and the defendant had dated since 1987 and share a child, but she has been married to someone else for two years prior to trial.

At the conclusion of the trial, the jury found the defendant not guilty of aggravated robbery; not guilty of Counts Two and Three, aggravated assault; and guilty of especially aggravated robbery. The defendant was sentenced as a Range I violent offender to twenty two-years in the Tennessee Department of Correction.

## II. Analysis

Before addressing the defendant's issues on appeal, we have thoroughly examined the record to determine the path the defendant has taken with his attorneys, eventually leading to his self-representation. Since his arrest, the defendant had the benefit of four appointed attorneys and one privately retained attorney. Prior to trial, the defendant was appointed a public defender who asked to be relieved from his position as trial counsel to the defendant. The trial court granted the public

defender's request, and the defendant retained an attorney to represent him at trial. At the conclusion of his trial, the defendant's retained attorney asked to be relieved from representing the defendant, and the court granted his motion. The trial court appointed another attorney to represent the defendant at sentencing, but the attorney moved to be relieved as defendant's counsel. The defendant also filed a motion to dismiss his attorney and proceed pro se. The trial court acquiesced, in light of each attorney citing the defendant as uncooperative and argumentative. From the record, we gather the trial court properly advised the defendant of the perils of self-representation, and the defendant made an intelligent and knowing waiver of his right to counsel. The record reflects the defendant's last attorney acted as elbow counsel as he proceeded pro se during his sentencing hearing.

## A. Sufficiency of the Evidence

The defendant argues the evidence is insufficient to support his especially aggravated robbery conviction. The proper inquiry for this Court to review the defendant's challenge to the sufficiency of the evidence to support a conviction is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

A guilty verdict accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The State is given the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). Questions regarding credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A verdict of guilt removes the presumption of innocence from the defendant and replaces it with a presumption of guilt, and on appeal, the defendant's burden is to demonstrate why the evidence is insufficient to support his guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant also argues the credibility of witnesses and argues the merits of each witness' testimony. The jury heard witness accounts of the robberies and viewed the defendant's videotaped statements to police. The defendant was only found guilty of especially aggravated robbery. Therefore, we will only review the record as it relates to the especially aggravated robbery of Sandra Christian, an employee of Arby's. Questions concerning the credibility of witnesses, the weight and value to be given evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This Court will not substitute its inferences for those drawn by the jury.

The defendant was convicted of especially aggravated robbery, in violation of Tennessee Code Annotated section 39-13-402(a). Our Code defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is defined as robbery "(1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a).

The defendant argues the evidence is insufficient to sustain his conviction because the testimony does not establish the necessary elements of especially aggravated robbery. This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In his videotaped statement to police, the defendant stated he could not remember the specifics of each robbery, but he remembered robbing several businesses for money and fleeing in his own car. Witness testimony clearly established the defendant as the perpetrator of the robbery at Arby's.

The defendant also claims he did not use a deadly weapon and Sandra Christian did not suffer serious bodily injury. The jury's finding that the defendant committed especially aggravated robbery required factual determinations that the defendant committed robbery with a deadly weapon and that the victim suffered serious bodily injury. See Tenn. Code Ann. § 39-13-403 (1997). Tennessee Code Annotated section 39-11-106(a)(5)(A) and (B) defines the term "deadly weapon" as:
> (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or
> (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

The large portable phone the defendant used to gain control over Sandra Christian would clearly fall within the definition of a "deadly weapon," as described in subsection (B). Some weapons are deadly by their very nature, such as firearms or knives. Other weapons are deadly by the reason of the manner in which they are used. Morgan v. State, 415 S.W.2d 879, 882 (1967). Testimony reveals the defendant brandished a portable phone large enough to require four "C" batteries. The victim testified the defendant hit her so hard with the army field-type phone that she fell back over her desk and a battery fell out of the phone. Although the record does not include pictures of the phone or the phone itself as an exhibit, we conclude the testimony substantiates the portable phone as a deadly weapon.

The defendant argues the trial court erred in allowing Sandra Christian to testify about the injuries she sustained as a result of the defendant hitting her with the phone because no medical reports or photographs were introduced to corroborate her testimony. Christian's testimony was vital for the State to prove the elements of especially aggravated robbery. All relevant evidence is admissible under Tennessee Rule of Evidence 402. Because Christian's testimony was relevant to the issue of whether she suffered serious bodily injury in connection to the robbery, this claim is without merit.

To prove the defendant committed especially aggravated robbery, the State must demonstrate both prongs of Tennessee Code Annotated section 39-11-106(a)(5)(A) and (B). The State must show that the defendant intentionally caused serious bodily injury to another. Tenn. Code Ann. §§ 39-13-101(a)(1), 39-13-102(a)(1)(A). "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

The defendant contends the State failed to present proof that the victim suffered "serious bodily injury." Specifically, he cites the Court's decision in State v. Sims, 909 S.W.2d 46 (Tenn. Crim. App. 1995), perm to appeal denied (Tenn. 1995), and asserts the victim's injury was inadequate to constitute serious bodily injury. In Sims, the victim suffered a broken nose, a bruised cheekbone, a cut across the bridge of her nose, and dental injuries. This Court held that the pain associated with a broken nose was not extreme enough to be classified as a serious bodily injury. Id.

In this case, the victim's injuries fell within the definition of serious bodily injury. The victim stated the defendant drew the phone back and hit her, causing her face to bleed, knocking her back, and causing one of the four "C" batteries inside the "army field type" phone to fall out. The victim testified she did not immediately seek medical care and the only medical treatment she received for her injury was the application of a butterfly bandage to the injury. However, the victim testified that a scar remains on her face, which extends from the bridge of her nose down the side of her face to the area right above her lip. Serious bodily injury includes a cut that involves a substantial risk of death, or protracted or obvious disfigurement. See Tenn. Code Ann. § 39-11-106(a)(2), (34)(A) & (D) (1997). The evidence establishes that the victim sustained a lengthy cut from her nose to just above her lip that was obvious to the jury. The distinction between bodily injury and serious bodily injury is generally a question of fact for the jury to determine. See State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). The record reveals that the prosecution requested the jury be allowed to view the victim's scar, and the trial court allowed the victim to stand in front of the jury. There are no pictures of the victim's injury contained in this record. We will not substitute our blind eye for the clear sight of a jury.

## B. Trial Court Relieving Counsel Prior to Sentencing

The defendant argues the trial court frustrated his right to appeal by relieving his trial counsel prior to sentencing. We conclude nothing in the record indicates the defendant's right to appeal has been frustrated by the actions of the trial court. If any actions have delayed or frustrated the defendant's right to appeal, the defendant's own actions have resulted in any delay. During the proceedings, the defendant has fallen out of favor with all of his attorneys and has demanded that he act as his own counsel. Prior to sentencing, the defendant's attorney admitted that he did not feel confident to represent the defendant, due to a lack of trust. The record indicates the defendant has been belligerent to the court and to his own counsel. Despite the warnings and advice of the trial court, the defendant chose to represent himself. Because a defendant has a Sixth Amendment right

to proceed without the assistance of counsel, the trial court could not force him to accept representation. See Faretta v. California, 422 U.S. 806, 821, 95 S. Ct. 2525, 2534, 45 L. Ed. 2d 562 (1975). Therefore, the defendant cannot blame the trial court.

## C.  Right to a Speedy Trial

The defendant argues his right to a speedy trial was violated. The defendant was initially indicted on December 2, 1997, by a Davidson County Grand Jury, indictment number 97-D-2580, for one count of aggravated robbery, two counts of aggravated assault, and one count of robbery for the June 18, 1997, robberies at West Meade Cleaners and Arby's. On July 20, 1997, the Attorney General dismissed indictment number 97-D-2580. On June 27, 2000, the defendant was re-indicted by a Davidson County Grand Jury, indictment number 2000-B-1181, of one count of aggravated robbery, two counts of aggravated assault, and one count of especially aggravated robbery for the crimes at issue. The defendant was arraigned and pleaded not guilty on July 19, 2000. The defendant's trial began on September 18, 2000, and the jury returned its verdict on September 21, 2000. The defendant was held until his sentencing hearing on September 26, 2001.

To determine whether an appellant's right to a speedy trial has been violated, this Court must consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defendant was prejudiced by the delay. Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101 (1972); State v. Vance, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994).

## 1.  Length of Delay

The defendant claims the length of the delay in bringing his case to trial was unwarranted and, in its brief to this Court, the State concedes that further inquiry is needed. A delay of one year or longer marks the point at which courts deem unreasonable enough to trigger further inquiry. State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997). Therefore, the length of the delay in bringing the defendant to trial triggers further inquiry.

## 2.  Reason for Delay

Reasons for delay in bringing a defendant to trial usually fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused or acquiesced in, by the defense. State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996). The record contains several motions by the defendant's attorneys to be relieved as counsel for the defendant. The record contains numerous references to the defendant's aggressive attitude toward his attorneys and the exasperation of the trial court in contending with the defendant's behavior toward his counsel. Therefore, we conclude this factor weighs against the defendant's claim.

### 3. *Assertion of the Right to a Speedy Trial*

The record reflects the defendant asserted his right to a speedy trial for the first time in his pro se motion for a New Trial, filed on October 2, 2001. By this time, the defendant had been tried and sentenced. We conclude the defendant's failure to assert his right to a speedy trial weighs against his claim.

### 4. *Resulting Prejudice*

Three specific areas in the inquiry to determine whether a defendant has been prejudiced by a delay in bringing his case to trial are as follows: (1) undue and oppressive incarceration; (2) anxiety accompanying public accusation; and (3) impairment of ability to prepare a defense. Barker v. Wingo, 407 U.S. 514, 532, 92 S. Ct. 2182, 2193 (1972). The defendant has failed to show how he has experienced any prejudice by the delay, given his problems dealing with his attorneys. Our supreme court has held that showing prejudice is the most important part of the Barker weighing process. See State v. Wood, 924 S.W.2d 342, 348 (Tenn. 1996). There can be no finding of prejudice to the defendant as a result of the delay. We conclude this factor weighs heavily against the defendant.

In balancing all of the four factors, we conclude the defendant's right to a speedy trial was not violated.

## D. Unreasonable Delay in Sentencing

The defendant contends he should not have experienced an unreasonable delay in being sentenced. Tennessee Code Annotation section 40-35-209 requires the trial court to conduct a sentencing hearing "without unreasonable delay, but in no event more than forty-five (45) days" after acceptance of the finding of guilt. Tenn. Code Ann. § 40-35-209(a) (1997). However, statutory provisions which relate to the mode or timing of doing an act to which the statute applies are only directives and are not mandatory. State v. Jones, 729 S.W.2d 683, 685 (Tenn. Crim. App. 1986).

The defendant was convicted on September 21, 2000, and was sentenced on September 26, 2001. The record reflects the defendant attempted to manipulate the judicial system through his inability to maintain an appropriate relationship with counsel. As previously discussed, the defendant had the benefit of five attorneys, with each seeking to be relieved from service due to the defendant's hostile behavior. The defendant's sentencing hearing was originally set for November 1, 2000. On October 18, 2000, the defendant's last attorney attempted to be relieved. The trial court granted the attorney's motion but required another attorney to aid the defendant as elbow counsel. The record does not indicate the State attempted to gain a tactical advantage or to harass the defendant. Instead, the defendant seems to have caused most, if not the majority, of the delay. We conclude the defendant's right to a timely sentencing hearing was not violated.

## E. Severance of the Offenses

Because the offenses occurred in different locales, the defendant moved to sever the counts of the indictment. The defendant contends the trial court erroneously denied his request for a severance of the offenses. A motion for severance of offenses is a matter which addresses itself to the sound discretion of the trial court, and this Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the court's ruling. State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990); State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). The trial court must make a determination that the evidence of one crime is relevant to a material issue in the trial of the other. State v. Hoyt, 928 S.W.2d 935, 944-45 (Tenn. Crim. App. 1995). It is permissible to join offenses under Rule 8(b) of the Tennessee Rules of Criminal Procedure "if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." See Tennessee Rules of Criminal Procedure Rule 8(b). Under Rule 14(b)(1), a defendant shall have the right to severance of the offenses unless the offenses are (a) part of a common scheme or plan and (b) the evidence of one would be admissible upon the trial of the others. Hoyt, 928 S.W.2d at 943; State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993).

The record reflects that on June 18, 1997, the defendant took part in a crime spree from Arby's to the West Meade Cleaners. In this case, the defendant's scheme was to steal cash from Arby's and drive to West Meade Cleaners to rob the employees at gunpoint. The defendant was driven by his accomplice from both crime scenes in the same car. There is no indication in the record that the first and second robbery were not part of the defendant's overall common scheme or plan. Furthermore, a link in identifying the perpetrators was established among all of the witnesses who saw the defendant escape into his car, wearing the same clothes witnesses described at both crime scenes. The defendant's videotaped statement was shown to the jury in which the defendant confesses to committing the robberies. Evidence of each crime was relevant to show identity, guilty knowledge, intent, or motive with respect to the other crime. See Tenn. R. Evid. 404(b); Hoyt, 928 S.W.2d at 944. The probative value of this evidence outweighs any prejudicial effect on the defendant. For these reasons, the defendant's issue is without merit.

## F. Ineffective Presentment of Issues

The defendant has presented several issues to this Court, but has failed to argue these issues or support the issues with cited authorities. The defendant alleges the trial judge erred by failing to recuse himself and he (the defendant) was the victim of a malicious prosecution. The defendant also contends he was denied the right to be present during jury deliberations. After a thorough review of the record, there appears to be no evidence of either impartiality or bias of the trial judge or wrong doing by the prosecution. Furthermore, the secrecy underlying jury deliberations is well established. Rushing v. State, 565 S.W.2d 893, 895 (Tenn. Crim. App. 1977). The defendant had no right to be present during jury deliberations. Due to the foregoing reasons, we conclude the defendant has waived these issues for failure to adequately argue his issues and cite authorities in support of his arguments. See T.R.A.P. 27(a)(7).

## G.  Sentencing

The defendant argues the trial court improperly sentenced him to twenty-two years imprisonment.  When an accused challenges the length and manner of service of a sentence, our Court conducts a de novo review on the record with a presumption that the trial court is correct in its determinations.  Tenn. Code Ann. § 40-35-401(d).  The presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all facts and circumstances.  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1994).

In conducting a de novo review of a sentence, we must consider (1) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-103 and -210.

The defendant was sentenced as a Range I standard offender of especially aggravated robbery, a Class A felony.  Class A felonies are subject to a sentence range of fifteen to twenty-five years.  Tenn. Code Ann. § 40-35-112(a)(1).  In the absence of enhancement and mitigating factors, the presumptive length of a sentence for a Class A felony is the mid-point of the sentencing range, which is twenty years.  Tenn. Code Ann. § 40-35-210(c).  Where both enhancement and mitigating factors apply, the trial court must start at the minimum sentence, enhance the sentence within the range as appropriate to the enhancement factors, and then reduce the sentence within the range as appropriate to the mitigating factors.  Tenn. Code Ann.§ 40-35-210(c).  The weight afforded an enhancement or mitigating factor is left to the discretion of the trial court so long as the trial court complies with sentencing purposes and principles and its findings are supported by the record.  State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).  The trial court acknowledged the defendant's voluminous criminal history, as evidenced by twenty-one prior offenses and that the offense involved more than one victim. We find that there were multiple victims involved in the instant offense.  Because the defendant did not argue any mitigating factors, the trial court did not apply mitigating factors toward his sentence and sentenced him to twenty-two years.  Because the especially aggravated robbery only named Sandra Christian as a victim, we conclude the trial court erred in finding that multiple victims were involved in the instant offense.  Nevertheless, the defendant's extensive criminal history justifies sentencing the defendant two years above the presumptive sentence of twenty years.

## III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-14-